No. 25-3955

———————————————

*In re* PESTICIDE ACTION AND AGROECOLOGY NETWORK NORTH AMERICA, ALIANZA NACIONAL DE CAMPESINAS, CALIFORNIA RURAL LEGAL ASSISTANCE FOUNDATION, FARMWORKER ASSOCIATION OF FLORIDA, FARMWORKER JUSTICE, GREENLATINOS, LABOR COUNCIL FOR LATIN AMERICAN ADVANCEMENT, NATURAL RESOURCES DEFENSE COUNCIL, PINEROS Y CAMPESINOS UNIDOS DEL NOROESTE, and UFW FOUNDATION,

Petitioners,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

Respondent.

———————————————

**EPA'S RESPONSE TO PETITION FOR WRIT OF MANDAMUS**

———————————————

ADAM R.F. GUSTAFSON
Acting Assistant Attorney General
Environment & Natural Resources Division

LAURA J. GLICKMAN
Of Counsel:                          Environmental Defense Section
                                     U.S. Department of Justice
DEVI CHANDRASEKARAN                  P.O. Box 7611
ANGELA HUSKEY                        Washington, D.C. 20044
ERIN KOCH                            (202) 514-6390
U.S. Environmental Protection Agency laura.glickman@usdoj.gov

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................. iii

GLOSSARY ...................................................................................... vi

INTRODUCTION ............................................................................... 1

I. Statutory and Regulatory Background ......................................... 2

    A. The Federal Food, Drug, and Cosmetic Act ......................... 2

    B. The Federal Insecticide, Fungicide, and Rodenticide Act .................... 5

II. Factual and Procedural Background ............................................. 6

ARGUMENT ..................................................................................... 14

I. Petitioners Have Not Proven a Clear and Indisputable Right to
Mandamus Relief. ....................................................................... 14

    A. Mandamus Relief is Not Warranted Under the *TRAC*
Factors. .................................................................................. 15

        1. A Rule of Reason Supports Additional Time in
This Case. ........................................................................ 15

        2. The Statutory Scheme Supports Additional Time
in This Case. ................................................................... 20

        3. Health and Welfare Concerns and Other Interests
Do Not Support a Finding of Unreasonable Delay. ................. 22

        4. EPA's Competing Priorities Impact the Time
Frame for Action on the Administrative Petition. .................... 24

        5. There Is No Allegation of Impropriety Here. .......................... 26

II. If the Court Grants the Mandamus Petition, It Should Issue a
Writ Only Ordering EPA to Respond to the Administrative
Petition. ...................................................................................... 26

CONCLUSION ................................................................................29

# TABLE OF AUTHORITIES

## Cases

*Am. Hosp. Ass'n v. Burwell*,
  812 F.3d 183 (D.C. Cir. 2016) ...................................................13

*Clorox Co. v. U.S. Dist. Court for N. Dist. of Cal.*,
  779 F.2d 517 (9th Cir. 1985)....................................................13

*In re A Community Voice*,
  878 F.3d 779 (9th Cir. 2017) ...................................................28

*In re Am. Rivers & Idaho Rivers United*,
  372 F.3d 413 (D.C. Cir. 2004) .................................................27

*In re Barr Lab'ys., Inc.*,
  930 F.2d 72 (D.C. Cir. 1991) ...................................................25

*In re Bluewater Network*,
  234 F.3d 1305 (D.C. Cir. 2000) ..............................................13

*In re Cal. Power Exch. Corp.*,
  245 F.3d 1110 (9th Cir. 2001)............................................14, 15

*In re Core Commc'n, Inc.*,
  531 F.3d 849 (D.C. Cir. 2008) ................................................16

*In re Medicare Reimbursement Litig.*,
  414 F.3d 7 (D.C. Cir. 2005) ....................................................13

*In re PANNA*,
  532 Fed. App'x. 649 (9th Cir. 2013) ...........................16, 19, 20, 22

*In re PANNA*,
  798 F.3d 809 (9th Cir. 2015)....................................................28

*In re PANNA*,
  840 F.3d 1014 (9th Cir. 2016)..................................................28

*In re United Mine Workers of Am. Int'l Union*,
  190 F.3d 545 (D.C. Cir. 1999) ................................................18

*Indep. Mining Co. v. Babbit,*
　105 F.3d 502 (9th Cir. 1997) .......................................................19, 21,

*Kerr v. U.S. Dist. Court for N. Dist. of Cal.,*
　426 U.S. 394 (1976) ...................................................................13,

*Pub. Util. Comm'r of Or. v. Bonneville Power Admin.,*
　767 F.2d 622 (9th Cir. 1985) .....................................................13,

*Sierra Club v. Thomas,*
　828 F.2d 783 (D.C. Cir. 1987) .......................................14, 17, 22, 24

*Telecomm. Rsch. & Action Ctr. v. FCC,*
　750 F.2d 70 (D.C. Cir. 1984) ................................. 13, 15, 16, 22, 26

**Statutes**

5 U.S.C. § 555(b) .........................................................................20

7 U.S.C. §§ 136-136y ....................................................................2

7 U.S.C. § 136(bb) .........................................................................5

7 U.S.C. § 136a(a) .........................................................................5

7 U.S.C. § 136a(c)(5) .....................................................................5

7 U.S.C. § 136a(g) ......................................................................5, 25

7 U.S.C. § 136a(g)(1)(A) ................................................................5

7 U.S.C. § 136a-1 ...........................................................................5

7 U.S.C. § 136d(b) ........................................................................28

7 U.S.C. § 136n(b) ........................................................................17

7 U.S.C. § 136w(d) ........................................................................28

7 U.S.C. § 136w-8(f) .....................................................................25

21 U.S.C. § 346a .............................................................................2

21 U.S.C. § 346a(b)(2)(A)(i) ...........................................................3

iv

21 U.S.C. § 346a(b)(2)(A)(ii) ................................................................... 3

21 U.S.C. § 346a(b)(2)(B) ........................................................................ 24

21 U.S.C. § 346a(b)(2)(C) ........................................................................ 3

21 U.S.C. § 346a(b)(2)(D) ........................................................................ 3

21 U.S.C. § 346a(b)(2)(D)(i) ................................................................ 3, 17

21 U.S.C. § 346a(d)(1) .............................................................................. 4

21 U.S.C. § 346a(d)(1)(A) ........................................................................ 4

21 U.S.C. § 346a(d)(3) .............................................................................. 4

21 U.S.C. § 346a(d)(4)(A) ............................................................. 4, 21, 28

21 U.S.C. § 346a(d)(4)(B) .................................................................. 4, 21

21 U.S.C. § 346a(d)(4)(C) ............................................................. 4, 21, 24

21 U.S.C. § 346a(e)(1) .............................................................................. 4

21 U.S.C. § 346a(q) .................................................................................. 5

Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, 136 Stat. 4459 .. 6, 20

**Code of Federal Regulations**

40 C.F.R. § 155.40(c)(1) ........................................................................... 5

40 C.F.R. § 155.53(a) ............................................................................... 5

40 C.F.R. § 155.56 ................................................................................... 6

40 C.F.R. § 155.58(a) ............................................................................... 6

40 C.F.R. § 155.58(b) ............................................................................... 6

40 C.F.R. § 155.58(c) ............................................................................... 6

**Federal Register**

87 Fed. Reg. 41310 (July 12, 2022) ...................................................... 10

## GLOSSARY

EPA                 Environmental Protection Agency

FFDCA               Federal Food, Drug, and Cosmetic Act

FIFRA               Federal Insecticide, Fungicide, and Rodenticide Act

## INTRODUCTION

Petitioners contend that the U.S. Environmental Protection Agency ("EPA") has unreasonably delayed action on their 2021 administrative petition (the "Administrative Petition") seeking food tolerance revocations and pesticide registration cancellations for 15 organophosphates.[1] Specifically, the Administrative Petition asks EPA to revoke food tolerances issued under the Federal Food, Drug, and Cosmetic Act ("FFDCA"), and to cancel pesticide registrations under the Federal Insecticide, Fungicide, and Rodenticide Act ("FIFRA") for these organophosphates. EPA has not unreasonably delayed action, and Petitioners have not shown that they are entitled to the extraordinary remedy of a writ of mandamus.

Far from sitting on its hands, EPA has been working diligently to complete the complex scientific assessments of human health risks necessary to respond to the Administrative Petition. Between 2015 and 2020, EPA completed initial human health risk assessments—relevant to both its FFDCA and FIFRA analyses—for all but one of the organophosphates included in Administrative Petition. New science suggests that certain of the assumptions in those assessments might have been

_____

[1] The Administrative Petition seeks revocation of tolerances and cancellation of registrations for 15 organophosphates: acephate, bensulide, chlorethoxyfos, diazinon, dichlorvos, dimethoate, ethoprop, malathion, naled, phorate, phosmet, terbufos, tribufos, chlorpyrifos-methyl, and dicrotophos, ER-12–13, the last two of which are not included in the Mandamus Petition. *See* Pet. at 27.

1

inaccurate. EPA has since completed revised human health risk assessments for five organophosphates and taken action on two of the organophosphates listed in the Administrative Petition.

Although the Administrative Petition raises important questions of human health and safety, the public is best served by affording EPA time to consider the available science and get these analyses right. Less than four years have elapsed since Petitioners filed the Administrative Petition, which asks EPA to take action on 15 organophosphates under two different statutes. And EPA has a reasonable plan to respond to the Administrative Petition. This Court has denied mandamus petitions in similar circumstances, and here, too, it should deny the Petition for a Writ of Mandamus.

## BACKGROUND

### I.     Statutory and Regulatory Background

EPA regulates pesticides under both the FFDCA, *see* 21 U.S.C. § 346a, and FIFRA, 7 U.S.C. §§ 136-136y.

#### A.      The Federal Food, Drug, and Cosmetic Act

The FFDCA authorizes EPA to establish "tolerances," which are maximum levels of pesticide residue allowed in or on food. 21 U.S.C. § 346a. EPA may establish a tolerance for a pesticide if EPA determines that the tolerance is "safe," and EPA must revoke or modify a tolerance if the Agency later determines that the

tolerance is not "safe." *Id.* § 346a(b)(2)(A)(i). "Safe" means that "there is a reasonable certainty that no harm will result from aggregate exposure to the pesticide chemical residue, including all anticipated dietary exposures and all other exposures for which there is reliable information." *Id.* § 346a(b)(2)(A)(ii). EPA must consider nine factors, and may consider other relevant factors, when it establishes, modifies, leaves in effect, or revokes a tolerance for a pesticide chemical residue. *Id.* § 346a(b)(2)(D). For example, EPA must consider "the validity, completeness, and reliability of the available data from studies of the pesticide chemical and pesticide chemical residue." *Id.* § 346a(b)(2)(D)(i).

In 1996, Congress amended the FFDCA with the Food Quality Protection Act, which instructed EPA, among other things, to assess the risks of pesticides based on available information concerning the special susceptibility of infants and children to pesticide chemical residues. *Id.* § 346a(b)(2)(C). To ensure that there is reasonable certainty that no harm will result to infants and children from aggregate exposure to pesticide chemical residues, Congress mandated that EPA apply an additional ten-fold margin of safety in setting certain tolerances, unless reliable data show that a different margin of safety will be protective for infants and children. *Id.*

The FFDCA sets forth a multi-stage procedural framework for the

3

establishment, modification, or revocation of tolerances. The first stage may be initiated by EPA acting on its own accord or in response to an administrative petition. *Id.* § 346a(d)(1), (e)(1). "Any person may file with [EPA] a petition proposing the issuance of a regulation . . . establishing, modifying, or revoking a tolerance for a pesticide chemical residue in or on a food." *Id.* § 346a(d)(1)(A). If EPA determines that an administrative petition meets the statutory and regulatory requirements governing petition contents, EPA publishes a notice of the administrative petition's filing. *Id.* § 346a(d)(3). EPA must then give "due consideration" to the petition and issue: (i) a final regulation establishing, modifying, or revoking a tolerance; (ii) a proposed regulation subject to public notice and comment and thereafter issue a final regulation, all pursuant to the separate provisions of 21 U.S.C. § 346a(e); or (iii) an order denying the petition. *Id.* § 346a(d)(4)(A).

Except for minor exceptions for petitions to establish tolerances or exemptions for pesticide chemical residues that appear to pose a significantly lower risk to human health from dietary exposure than pesticides with existing tolerances for the same or similar uses, Congress has not otherwise set forth any specific deadline for EPA's action on an administrative petition. *Id.* § 346a(d)(4)(B) and (C).

4

**B.    The Federal Insecticide, Fungicide, and Rodenticide Act**

FIFRA generally requires EPA approval of pesticides prior to distribution or sale and establishes a registration regime to regulate their use. 7 U.S.C. § 136a(a). EPA must approve an application for pesticide registration if, among other things, the pesticide will not cause "unreasonable adverse effects on the environment." *Id.* § 136a(c)(5). In contrast to the FFDCA's risk-only safety standard, FIFRA's "unreasonable adverse effects" standard means "any unreasonable risk to man or the environment," taking into consideration both risks and benefits of the pesticide, including whether the pesticide tolerance is "safe" under the FFDCA. *Id.* § 136(bb).

EPA must "periodically" reevaluate the registrations of all currently registered pesticides. *Id.* § 136a(g)(1)(A).[2] During "registration review," EPA assesses all registered pesticides and must ensure that each pesticide registration continues to satisfy FIFRA's "unreasonable adverse effects" standard, taking into account new scientific information and changes to risk-assessment procedures, methods, and data requirements. 40 C.F.R. §§ 155.40(c)(1), 155.53(a); 7 U.S.C. § 136a(g). EPA may propose measures to mitigate identified risks, including label or

---

[2] Registration review for the organophosphates follows a prior re-evaluation of this class of pesticides called "reregistration." By 2006, FIFRA and the FFDCA, respectively, required EPA to reregister any pesticide registered prior to November 1, 1984, and to reassess all tolerances in effect as of August 2, 1996. 7 U.S.C. § 136a-1; 21 U.S.C. § 346a(q).

5

registration changes, in a proposed decision or proposed interim decision. *See* 40 C.F.R. §§ 155.56, 155.58(a)–(b). EPA must issue a final registration review decision to conclude registration review. *See id.* § 155.58(c). EPA must complete certain registration review cases, including those for the organophosphates at issue here, by October 1, 2026. Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, § 711, 136 Stat. 4459. FIFRA does not provide a procedural framework for assessing administrative petitions for pesticide cancellation.

## II.    Factual and Procedural Background

Organophosphates are a group of pesticides that play an important role in protecting numerous agricultural crops from destructive insect pests, protecting livestock, and protecting people by, for instance, controlling disease-carrying mosquitoes. Decl. of Ed Messina ¶ 18. Organophosphates work by affecting the functioning of the nervous system. *Id.* ¶ 19. Specifically, organophosphates inhibit the enzyme acetylcholinesterase, which breaks down the neurotransmitter acetylcholine, eventually leading to insect death. *Id.* In humans, high levels of acetylcholine can cause a suite of neurological effects, such as tremors, fatigue, and nausea. *Id.* EPA's human health risk assessments for organophosphates typically use the inhibition of acetylcholinesterase as the health-protective endpoint, i.e., the human health effect most sensitive to organophosphate exposure. *Id.*

In 2006, EPA completed "reregistration" and tolerance reassessment for organophosphates, in which the Agency determined that existing organophosphate tolerances were safe under the FFDCA and that the organophosphates met FIFRA's "unreasonable adverse effects" standard. *See* 9-SER-2257–2531.

Soon after completing reregistration, EPA began working on registration review, which requires the evaluation of a vast body of data to assess the potential human health effects of organophosphates. Messina Decl. ¶ 22–24. These analyses have proven far more complex than EPA originally anticipated. *Id.* ¶ 23. In 2016, EPA completed a review of epidemiological, laboratory animal, and in vitro studies to evaluate the potential for organophosphates to cause adverse neurodevelopmental effects.[3] ER-214–391. That review identified uncertainties regarding the doses at which potential adverse neurodevelopmental effects could occur in humans. ER-237. Thus, EPA conservatively assumed that all organophosphates have the same potential to cause neurodevelopmental effects and retained the default tenfold safety factor in the Food Quality Protection Act for all dietary risk assessments. ER-305–06. EPA intended to continue to evaluate any new epidemiological studies and refine its analyses of the dose at which neurodevelopmental effects may occur. Messina Decl. ¶ 24.

---

[3] In vitro studies are conducted in laboratories using cells or tissues from organisms.

7

From 2015 to 2020, consistent with the Agency's standard practice for registration review, EPA completed initial human health risk assessments for all but one of the organophosphates that are included in the Administrative Petition. *See* 3-SER-0653–0811; 6-SER-1388–1484; 4-SER-0934–1013; 8-SER-1957–2008; 4-SER-1014–1127; 2-SER-0330–0515; 6-SER-1589–1685; 6-SER-1485–1588; 7-SER-1687–1780; 5-SER-1129–1386; 2-SER-0516–3-SER-0652; 3-SER-0812–4-SER-0933; 7-SER-1781–1871; 7-SER-1872–1955. *Cf.* 10-SER-2533–2592. Each initial human health risk assessment identified risks of concern. *See* Messina Decl. ¶ 24. Relying on the 2016 review, which conservatively assumed that all organophosphates have the same potential to cause neurodevelopmental effects, the initial human health risk assessments used acetylcholinesterase inhibition as the health-protective endpoint and retained the default tenfold safety factor in the Food Quality Protection Act for all dietary risk assessments. *See id.* Simultaneously, EPA participated in domestic and international efforts to develop data to better understand the potential for organophosphates to cause neurodevelopmental effects, well aware that the new science could impact the ultimate conclusions in those risk assessments. *Id.* ¶ 27.

Typically, when initial human health risk assessments show risks of concern, EPA identifies measures to address the risks of concern in initial human health risk assessments and negotiates adoption of those measures with registrants. Messina

Decl. ¶ 26. Here, however, EPA did not do that because it is refining the initial risk assessments to include new science known as "new approach methodologies" from in vitro tests that evaluated key neurodevelopmental processes. *Id.* ¶ 26–28. The new approach methodologies enable further refinement in EPA's evaluation of potential developmental neurotoxicity and can impact uncertainty factors used in EPA's assessment of each individual organophosphate. *Id.* ¶ 26–30. These changes may affect the final conclusions in the risk assessments. *See id.* ¶ 28. The 2020 FIFRA Scientific Advisory Panel, which serves as EPA's peer reviewer for significant regulatory and policy matters involving pesticides, indicated support for using the new approach methodologies in risk assessments. *See* 2-SER-0272–0329. Thus, to ensure the accuracy of its scientific conclusions, EPA is revising the initial human health risk assessments to integrate the best available science, including new approach methodologies. Messina Decl. ¶ 29.

On November 18, 2021, Petitioners submitted the Administrative Petition, which requests that the Agency revoke tolerances and cancel registrations for 15 organophosphates. ER-9, ER-12–13. The Administrative Petition also asks EPA to update the initial human health risk assessments to use an endpoint that Petitioners argue better protects children from neurodevelopmental harm. ER-9. EPA published notice of the Administrative Petition in the Federal Register, which

generated over 54,000 public comments, of which approximately 520 were unique submissions. Messina Decl. ¶ 40; 87 Fed. Reg. 41310 (July 12, 2022).

Since then, EPA has continued to work diligently to refine its analyses of the human health impacts of organophosphates. In 2023, EPA released a paper describing how it plans to use the new approach methodologies to evaluate the potential for developmental neurotoxicity and explaining that it would perform these evaluations on a chemical-by-chemical basis. 1-SER-0261–0270. Specifically, EPA explained that data from epidemiological, laboratory animal, and in vitro studies in weight-of-evidence evaluations allows EPA to make chemical-specific evaluations of developmental neurotoxicity potential and to methodically determine an appropriate safety factor under the Food Quality Protection Act as opposed to retaining the default factor. *Id.* Also in 2023, based on a review of the in vitro acetylcholinesterase inhibition data presented to the 2020 FIFRA Scientific Advisory Panel, EPA explained how it plans to address inherent uncertainty when extrapolating from rat studies to human health risk assessments. 1-SER-0086–0108.

EPA has made significant progress in its analysis of the organophosphates in registration review under FIFRA. EPA completed a proposed interim decision for chlorpyrifos-methyl (one of the pesticides listed in the Administrative Petition), after which registrants of that chemical voluntarily cancelled all registrations. 1-

10

SER-0255–0260. EPA also completed an interim decision for dicrotophos, which identified various mitigation measures to reduce exposure to both farmworkers and bystanders, including children, which EPA determined was necessary for the pesticide to continue to meet FIFRA's unreasonable adverse effects standard. 1-SER-0002–0085. EPA also released updated occupational and non-occupational spray drift exposure risk assessments for diazinon, ethoprop, tribufos, and phosmet, all of which identified significant human health risks for workers. ER-1803–1886; ER-1887–1936; ER-1938–2066; ER-2067–2120. In advance of completing registration review for those four chemicals, EPA worked with pesticide registrants to accelerate mitigation of those risks, including working with registrants to voluntarily cancel some products and use patterns and to implement other changes through label amendments. *See* ER-1788–1789; ER-1790–1791; ER-1792–1793; ER-1794–1795, ER-1799–1801, ER-1802. The Agency has completed revised human health risk assessments and proposed interim review decisions for acephate, dimethoate, and malathion. ER-2122–2244; ER-2245–2300; ER-2301–2360; ER-2362–2460; ER-2461–2571; ER-2572–2625.

EPA has an aggressive plan to respond to the Administrative Petition. Although EPA typically responds to administrative petitions in a single response, here, to expedite action, EPA intends to respond to the Administrative Petition by

grouping individual organophosphates. Messina Decl. ¶ 42. EPA plans to respond

to the Administrative Petition as follows:

| Pesticide | Response date(s) |
|---|---|
| Acephate, Chlorethoxyfos, Dichlorvos (DDVP), Dimethoate, Malathion, Naled, and Tribufos | FFDCA and FIFRA claims in 2026 |
| Bensulide, Diazinon, Ethoprop, Phorate, and Terbufos | FFDCA claims in 2026 and FIFRA claims in conjunction with registration review |
| Phosmet | Responding in conjunction with registration review, since forthcoming additional data is relevant to the human health risk assessment |

*Id.* ¶¶ 44–46.

Petitioners filed the Mandamus Petition on June 25, 2025, which seeks an

order directing EPA to respond to the Administrative Petition and to set deadlines

for any subsequently necessary regulatory actions for 13 of the 15

organophosphates listed in the Administrative Petition. Pet. at 2. The Mandamus

Petition excludes chlorpyrifos-methyl and dicrotophos, discussed *supra* at 10–11.

It also combines dichlorvos (DDVP) and naled, which EPA treats separately in its

human health risk evaluations. *See* ER-976–1066; ER-1067–1178.

## STANDARD OF REVIEW

"Mandamus is an extraordinary remedy and one that will be employed only

12

in extreme situations." *Clorox Co. v. U.S. Dist. Court for N. Dist. of Cal.*, 779 F.2d 517, 519 (9th Cir. 1985); *see also Kerr v. U.S. Dist. Court for N. Dist. of Cal.*, 426 U.S. 394, 402 (1976) ("The remedy of mandamus is a drastic one, to be invoked only in extraordinary situations."). The issuance of writs directed to agency action is rare and the scope of relief granted, if any, should be narrow. *Pub. Util. Comm'r of Or. v. Bonneville Power Admin.*, 767 F.2d 622, 630 (9th Cir. 1985).

"To show entitlement to mandamus, plaintiffs must demonstrate (1) a clear and indisputable right to relief, (2) that the government agency or official is violating a clear duty to act, and (3) that no adequate alternative remedy exists." *Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016). These requirements are jurisdictional. *Id.* Even when these requirements are met, however, "a court may grant relief only when it finds compelling equitable grounds." *Id.* (quoting *In re Medicare Reimbursement Litig.*, 414 F.3d 7, 10 (D.C. Cir. 2005). "In the case of agency inaction, we not only must satisfy ourselves that there indeed exists such a duty, but that the agency has unreasonably delayed the contemplated action." *In re Bluewater Network*, 234 F.3d 1305, 1315 (D.C. Cir. 2000) (cleaned up). The central question in evaluating "a claim of unreasonable delay" is "whether the agency's delay is so egregious as to warrant mandamus." *Telecomm. Rsch. & Action Ctr. v. FCC* ("*TRAC*"), 750 F.2d 70, 79 (D.C. Cir. 1984).

Regarding unreasonable delay claims such as this one, an agency is entitled to substantial deference in establishing a timetable for completing administrative proceedings. *Sierra Club v. Thomas*, 828 F.2d 783, 797 (D.C. Cir. 1987). The courts have therefore recognized that they are generally "ill-suited to review the order in which an agency conducts its business" and are "hesitant to upset an agency's priorities by ordering it to expedite one specific action, and thus to give it precedence over others." *Id.* Thus, mandamus relief may be warranted only in the very limited circumstance where agency action has been delayed to such an extent that it frustrates the court's role of providing a forum for review. *In re Cal. Power Exch. Corp.*, 245 F.3d 1110, 1124 (9th Cir. 2001).

## ARGUMENT

### I. Petitioners Have Not Proven a Clear and Indisputable Right to Mandamus Relief.

Petitioners have failed to meet their burden of proving that the extraordinary remedy of mandamus should be available here. Less than four years have passed since Petitioners filed their Administrative Petition. In that time, EPA has made significant progress on the complex scientific analyses of human health impacts necessary to respond. Moreover, EPA has an aggressive plan to respond to the Administrative Petition. Therefore, EPA has not unreasonably delayed action, and the Court should not take the drastic step of granting mandamus relief establishing a deadline for EPA to complete its consideration of the remaining issues raised in

14

the Administrative Petition. Rather, EPA should be allowed to complete its review in a timeframe dictated by sound science and in recognition of other competing priorities.

## A. Mandamus Relief is Not Warranted Under the *TRAC* Factors.

In cases seeking mandamus based upon claims of unreasonable agency delay, this Court has adopted the factors set forth by the District of Columbia Circuit in *TRAC*. *In re Cal. Power Exch. Corp.*, 245 F.3d at 1124–25. *TRAC* articulated six factors as guidance for review of unreasonable delay claims:

> (1) the time agencies take to make decisions must be governed by a "rule of reason,"; (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason; (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake; (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority; (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and (6) the court need not "find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed.'"

*TRAC*, 750 F.2d at 79–80 (citations omitted). Application of these factors should result in the denial of mandamus relief here.

### 1. A Rule of Reason Supports Additional Time in This Case.

The first and "most important factor" is that "the time agencies take to

15

make decisions must be governed by a rule of reason." *In re Core Commc'n, Inc.*, 531 F.3d 849, 855 (D.C. Cir. 2008) (quoting *TRAC,* 750 F.2d at 80). A rule of reason in this case must take into account that actions on the 13 pesticides at issue in the Mandamus Petition require individual decisions for each pesticide under the FFDCA and FIFRA. Each of those decisions requires EPA to assess data for that individual pesticide and data that applies to multiple pesticides. And those complex assessments are at the frontiers of science. *See In re PANNA*, 532 Fed. App'x. 649, 651 (9th Cir. 2013).

Even before it received the Administrative Petition, EPA has been hard at work analyzing the human health impacts of these organophosphates. Indeed, while the Agency was completing initial human health risk assessments for all but one of the organophosphates in the Administrative Petition, EPA participated in domestic and international efforts to develop data to inform the organophosphate human health risk assessments, well aware that the new science could impact the ultimate conclusions in those risk assessments. Messina Decl. ¶ 27. Because the new data is reliable and improves the accuracy of the human health risk assessments, EPA has been revising those initial assessments to reflect these additional data. *Id.* ¶¶ 30-31. Ensuring that the scientific assessments are based on the most up-to-date and reliable information and methodologies is critical to

16

determining what, if any, changes to tolerances and registrations are necessary. *See id*. ¶ 26.

While continuing to refine the initial human health risk assessments, EPA has continued to make progress in its registration review. As discussed above, the Agency's efforts have resulted in cancellations of all registrations for chlorpyrifos-methyl and the adoption of risk mitigation measures for diazinon, ethoprop, tribufos, and phosmet. *See supra* at 10–11.

Petitioners contend that EPA is not acting fast enough (Pet. at 19–20), but to decide whether to grant or deny the Administrative Petition, EPA must ensure its human health risk assessments are based on sound science. Indeed, the FFDCA specifically requires EPA to consider "the validity, completeness, and reliability of the available data from studies of the pesticide chemical and pesticide chemical residue," which includes recent neurodevelopmental toxicity data. *See* 21 U.S.C. § 346a(b)(2)(D)(i). And FIFRA requires cancellation of pesticide registrations to be supported by "substantial evidence." 7 U.S.C. § 136n(b). Complying with these statutory requirements takes time. EPA should be afforded the time necessary to analyze complex scientific issues so that it can reach reliable results that are appropriately protective of public health and are not arbitrary and capricious or an abuse of discretion. *Sierra Club*, 828 F.2d at 798–99.

17

The time EPA spends evaluating the evolving science, including the new approach methodologies, will allow the Agency to make well-reasoned decisions for each organophosphate, which is important given the historically high benefits associated with this class of pesticides, and should both decrease the chance of future challenges to those decisions and increase the information available to a court if judicial review is sought. *Id.*; *In re United Mine Workers of Am. Int'l Union*, 190 F.3d 545, 554–55 (D.C. Cir. 1999) (finding agency's schedule not facially unreasonable in light of, inter alia, the agency's need to collect and analyze data in order to develop a rulemaking record because "the agency's plan may well shorten the overall period of delay by resolving issues that would otherwise become the subject of litigation").

EPA has an aggressive plan to respond to the Administrative Petition. Although EPA typically responds to administrative petitions in a single response, here, to expedite action, EPA intends to respond to the Administrative Petition by grouping individual organophosphates. Messina Decl. ¶ 42. EPA plans to respond to the Administrative Petition as follows:

| Pesticide | Response date(s) |
|---|---|
| Acephate, Chlorethoxyfos, Dichlorvos (DDVP), Dimethoate, Malathion, Naled, and Tribufos | FFDCA and FIFRA claims in 2026 |

| Bensulide, Diazinon, Ethoprop, Phorate, and Terbufos | FFDCA claims in 2026 and FIFRA claims in conjunction with registration review |
|---|---|
| Phosmet | Responding in conjunction with registration review, since forthcoming additional data is relevant to the human health risk assessment |

*Id.* ¶¶ 44–46.

The Court should defer to EPA's reasonable plan to address the issues raised in the Administrative Petition. *In re PANNA*, 532 F. App'x at 651 (denying mandamus where EPA "set forth a concrete timeline for final agency action").

Moreover, less than four years have elapsed since Petitioners filed the Administrative Petition. *See* Admin. Pet. (dated Nov. 18, 2021). The Ninth Circuit previously denied a mandamus petition filed four years and decided six years after the filing of an administrative petition under the FFDCA and FIFRA. *In re PANNA*, 532 Fed. App'x. at 650. And that mandamus petition sought action on a single organophosphate, whereas the Mandamus Petition at issue here seeks action on 13 organophosphates, each of which requires decisions under two separate statutes. Similarly, in *Independence Mining Co. v. Babbit*, the Ninth Circuit affirmed the denial of mandamus relief just four years after the plaintiff filed applications for mineral patents upon which the Department of Interior had not acted. 105 F.3d 502, 505 (9th Cir. 1997) (affirming 885 F.Supp. 1356 (D. Nev. 1995)). The Court should not grant mandamus so soon after the filing of an

19

administrative petition, particularly where, as is the case here, that Administrative Petition requires the evaluation of 15 pesticides under two different statutes.

Therefore, under the first and "most important" *TRAC* factor, this Court should defer to EPA's determination that it reasonably requires additional time to act on the remaining scientific issues raised in the Administrative Petition, and it should deny mandamus relief.

### 2. The Statutory Scheme Supports Additional Time in This Case.

The second *TRAC* factor considers whether the statutory scheme provides a timetable or other indication of the speed with which Congress expects the agency to proceed. Contrary to Petitioners' assertion, Pet. at 18, n.5, both FIFRA and the FFDCA fully support affording EPA the time necessary to consider the complex and evolving science raised in the administrative petition.

Under FIFRA, EPA has more than a year—until ***October 1, 2026***—to complete registration review. Consolidated Appropriations Act, 2023, Pub. L. No. 117-328, § 711, 136 Stat. 4459. While EPA must respond to the administrative petition "within a reasonable time," 5 U.S.C. § 555(b), that the statutory deadline for registration review has not passed shows that EPA's continued consideration of the FIFRA portions of the Administrative Petition is reasonable. *See In re PANNA*, 532 Fed. App'x. at 651 (considering future registration review deadline). Indeed, this Court previously affirmed the denial of mandamus relief where Congress had

20

provided "the exact timeframe within which the [Agency] is required to act."
*Indep. Min. Co.*, 105 F.3d at 509. Here, too, judicial intervention is unwarranted in
advance of the statutory deadline.[4] *See id.*

Nor does the FFDCA compel EPA to act sooner. *See In re PANNA*, 532 Fed.
App'x. at 651. The FFDCA requires EPA to prioritize or take expedited action on
certain categories of administrative petitions to establish tolerances or exemptions
for pesticide chemical residues that present a lower risk to human health than
existing tolerances. *See* 21 U.S.C. § 346a(d)(4)(B)–(C). The Administrative
Petition does not fall into these categories. Thus, the statutory scheme does not
require that EPA give priority to, or expedite its action on, the Administrative
Petition. *See id.* Rather, EPA must give "due consideration" and take one of three
actions on the Administrative Petition. *Id.* § 346a(d)(4)(A). The level of
consideration that is "due" will necessarily depend upon the complexity of the
issues raised in any particular petition. As discussed above, the issues raised in the
Administrative Petition are complex and require consideration of newly available
data.

---

[4] At this time, EPA does not anticipate completing registration review for any
organophosphates by October 1, 2026, due to EPA's obligations under the
Endangered Species Act, Messina Decl. ¶ 47. However, ordering compliance with
the statutory deadline that has not yet passed, simply because EPA has missed non-
binding internal deadlines, would be premature.

In light of the different deadline set by Congress for registration review under FIFRA and the FFDCA's requirement of "due consideration" without a distinct deadline, the Court should not substitute its judgment for that of EPA as to what time is reasonably necessary to appropriately address the Administrative Petition. Accordingly, the second *TRAC* factor weighs against granting the Mandamus Petition.

### 3. Health and Welfare Concerns and Other Interests Do Not Support a Finding of Unreasonable Delay.

For similar reasons, contrary to Petitioners' argument, *TRAC* factors three and five, which overlap, do not counsel in favor of finding any unreasonable delay in this case. Factor three concerns the length of delay when health and welfare are at stake and factor five provides that the court should consider the nature and extent of the interests prejudiced by any delay. *TRAC*, 750 F.2d at 79–80. These factors are not dispositive here, as EPA's entire docket involves issues concerning public and environmental health and welfare. *See Sierra Club*, 828 F.2d at 798. Rather, as this Court previously noted, "whether the public health and welfare will benefit or suffer from accelerating this particular rulemaking depends crucially upon the competing priorities that consume EPA's time, since any acceleration here may come at the expense of delay of EPA action elsewhere." *In re PANNA*, 532 Fed. App'x. at 651 (quoting 828 F.2d at 798).

In addition, in 2006, EPA determined that the existing tolerances for the 13 organophosphates at issue in the Mandamus Petition are safe and that those registrations met FIFRA's "unreasonable adverse effects" standard. *See supra* at 7. Petitioners, however, base their Mandamus Petition entirely on the EPA's initial human health risk assessments. Pet. at 19. EPA agrees that the Administrative Petition raises important safety questions, but EPA is presently working to address those concerns, which begins with revising those risk assessments. Neither EPA nor this Court can presume that Petitioners' claims regarding the safety of the organophosphates are necessarily correct, especially where the science continues to evolve. In particular, the new approach methodologies enable further refinement in EPA's evaluation of potential developmental neurotoxicity and can impact uncertainty factors used in EPA's assessment of each individual organophosphate. *See supra* at 9. This same data does not support Petitioners' contention that EPA's reliance on acetylcholinesterase inhibition endpoints is not health-protective. Revising the initial human health risk assessments is necessary to ensure that EPA's conclusions on risk are accurate, reflect the most updated available information, and can support any regulatory action EPA may pursue. *See id.*

That health and welfare concerns are implicated does not mean that EPA should not be afforded the time necessary to get the science right. The third *TRAC* factor merely recognizes that human health concerns are, on balance, more

23

important than economic concerns in the sense that delay is more tolerable when only economic concerns are at stake. It does not stand for the proposition that EPA should not be afforded the time necessary to evaluate new science just because EPA regulates in the realm of human health. In the case of organophosphates, the loss of their use might have a significant economic impact on food production and disease prevention. Messina Decl. ¶ 26. Thus, it is particularly important that EPA be afforded time to ensure the reliability of its analyses. Put differently, if EPA is going to remove organophosphates as a tool for farmers, it first should be able to show that doing so is necessary to protect human health.

Accordingly, the third and fifth *TRAC* factors are not dispositive here.

### 4. EPA's Competing Priorities Impact the Time Frame for Action on the Administrative Petition.

The fourth *TRAC* factor takes into account the effect that expediting agency action may have on agency activities of a higher or competing priority. Here, Congress has assigned EPA a very broad mandate not only under the FFDCA and FIFRA but also under other, equally complex environmental statutes. *Sierra Club*, 828 F.2d at 798. EPA has finite resources to meet these competing responsibilities. *Id.* But Congress has not required that EPA prioritize administrative petitions like Petitioners' over any of EPA's numerous other obligations. *See id.*; 21 U.S.C. § 346a(b)(2)(B), (d)(4)(C).

24

EPA has many competing obligations, some of which are subject to statutory deadlines. For example, EPA is charged with completing registration review for nearly 800 other pesticide active ingredients contained in registered pesticide products, which are subject to the October 1, 2026, registration review deadline. *See* 7 U.S.C. § 136a(g); Messina Decl. ¶ 50. In addition, EPA must devote considerable scientific resources to evaluating applications for new and amended pesticide products and other pesticide regulatory actions on short time frames (three months to two years, depending upon the nature and complexity of the action requested). 7 U.S.C. § 136w-8(f); Messina Decl. ¶ 51. In the average fiscal year, EPA completes over 10,000 such actions, including 1,500 for which there are statutory deadlines. Messina Decl. ¶¶ 49, 51. EPA must also balance work on other matters without statutory deadlines. Requiring EPA to devote all its resources to responding to the Administrative Petition would necessarily detract from EPA's ability to respond to other matters, including petitions. As the D.C. Circuit explained, "[a]ssuming constant resources . . . , a judicial order putting [one petition] at the head of the queue simply moves all others back one space and produces no net gain." *In re Barr Lab'ys, Inc.*, 930 F.2d 72, 75 (D.C. Cir. 1991). Thus, the fourth *TRAC* factor shows that EPA has not unreasonably delayed action here.

25

### 5. There Is No Allegation of Impropriety Here.

The sixth *TRAC* factor provides that the Court need not "find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed.'" *TRAC*, 750 F.2d at 80 (citations omitted). Petitioners have not suggested that EPA is acting in bad faith. Nor has there been any "lassitude" on EPA's part. Rather, as explained above and in the Messina Declaration, EPA is and has been diligently addressing the complex scientific issues raised in the Administrative Petition, and it reasonably requires additional time to finish its review. Therefore, to the extent the sixth *TRAC* factor has any bearing on this case at all, it counsels against a finding of unreasonable delay.

In sum, consideration of the *TRAC* factors shows that EPA has not unreasonably delayed action on the Administrative Petition and that the extreme remedy of mandamus is not warranted. The Court should dismiss the Mandamus Petition.

## II. If the Court Grants the Mandamus Petition, It Should Issue a Writ Ordering EPA to Respond Only to the Administrative Petition.

If the Court grants the Mandamus Petition, Petitioners ask the Court to order EPA to issue not just a written response to the Administrative Petition but also to set deadlines for any regulatory actions compelled by that response. Pet. at 27.

26

However, that relief would be outside the proper boundaries of a mandamus petition.

Should the Court grant the Mandamus Petition, it should decline Petitioners' request to order relief beyond the scope of the action allegedly unreasonably delayed—i.e., action on responding to the Administrative Petition. If Petitioners believe that the response to the Administrative Petition is less than complete, they may seek further relief from this Court.[5] At present, the only question properly before the Court is whether the Agency should be ordered to respond to the Administrative Petition by a date certain. *See, e.g., In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 420 (D.C. Cir. 2004) (ordering agency to respond to administrative petition).

The Mandamus Petition argues, however, that the Court regularly orders EPA to go beyond responding to an administrative petition and take the regulatory actions compelled by that response. Pet. at 27–28. The majority of cases Petitioners cite do not support that proposition, however. For example, in *In re A Community Voice*, unlike here, EPA had already granted the rulemaking petition eight years earlier when the Ninth Circuit

---

[5] If the Court believes the right to file a new mandamus petition would be insufficient to protect Petitioners, at most it should retain jurisdiction while the Agency completes action on the Administrative Petition. Should the Court retain jurisdiction, EPA opposes Petitioners' request to provide status reports every 60 days (Pet. at 30) and in instead suggests providing status reports every 90 days.

27

ordered EPA to issue proposed and final rules. 878 F.3d 779, 785 (9th Cir.
2017). In *In re PANNA*, the Ninth Circuit ordered EPA "to issue *either* a
proposed or final revocation rule *or* a full and final response to the
administrative petition" by a date certain. 798 F.3d 809, 815 (9th Cir. 2015)
(emphasis added). Indeed, those are the permissible responses to a petition
under the FFDCA. 21 U.S.C. § 346a(d)(4)(A). The Court further explained
that "[t]he only question before us is whether EPA's delay in responding to
the administrative petition warrants the extraordinary remedy of
mandamus." *In re PANNA*, 798 F.3d at 813. And when the Ninth Circuit
later set a deadline for promulgating a final revocation rule, unlike here,
EPA had already issued a proposed rule. *In re PANNA*, 840 F.3d 1014, 1015
(9th Cir. 2016).

In any event, initiating cancellation proceedings within 90 days for certain
organophosphates, as Petitioners request (Pet. at 27–28), is virtually impossible
given applicable procedural requirements. Specifically, EPA must provide a draft
Notice of Intent to Cancel to the Secretary of Agriculture and the FIFRA Scientific
Advisory Panel at least 60 days before publishing the final Notice in the Federal
Register. 7 U.S.C. §§ 136d(b), 136w(d). This would leave EPA with just 30 days
to finalize its assessment of risks and benefits, draft the Notice of Intent to Cancel,

28

and make any appropriate changes to the Notice in response to comments from the Secretary of Agriculture and the Scientific Advisory Panel.

Accordingly, should the Court grant the Mandamus Petition, it should order EPA to respond to the Administrative Petition but should decline to order EPA to take the regulatory actions compelled by that response.

## CONCLUSION

For the foregoing reasons, the Court should deny the Mandamus Petition and dismiss this case.

Respectfully submitted,

ADAM R.F. GUSTAFSON
*Acting Assistant Attorney General*
Environment & Natural Resources Division

/s/ *Laura J. Glickman*
LAURA J. GLICKMAN
*Senior Attorney*
Environmental Defense Section
U.S. Department of Justice
P.O. Box 7611
Washington, D.C. 20044
(202) 514-6390
laura.glickman@usdoj.gov

Of Counsel:

DEVI CHANDRASEKARAN
ANGELA HUSKEY
ERIN KOCH
*Attorneys*
U.S. Environmental Protection Agency

August 20, 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Ninth Circuit Rule 21-2(c) because it does not exceed 30 pages, excluding the parts exempted by Federal Rules of Appellate Procedure 21(a)(2)(C) and 32(f). The brief also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it was prepared in a proportionally spaced typeface using Microsoft Times New Roman 14-point font.

/s/ *Laura J. Glickman*

## CERTIFICATE OF SERVICE

I certify that the foregoing was served upon all counsel of record by the Court's CM/ECF system on August 20, 2025. All counsel of record are registered CM/ECF users.

/s/ *Laura J. Glickman*