No. 25-3955

---

*In re* PESTICIDE ACTION AND AGROECOLOGY NETWORK NORTH AMERICA, ALIANZA NACIONAL DE CAMPESINAS, CALIFORNIA RURAL LEGAL ASSISTANCE FOUNDATION, FARMWORKER ASSOCIATION OF FLORIDA, FARMWORKER JUSTICE, GREENLATINOS, LABOR COUNCIL FOR LATIN AMERICAN ADVANCEMENT, NATURAL RESOURCES DEFENSE COUNCIL, PINEROS Y CAMPESINOS UNIDOS DEL NOROESTE, and UFW FOUNDATION,

Petitioners,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,

Respondent.

---

DECLARATION OF EDWARD MESSINA IN SUPPORT OF U.S. ENVIRONMENTAL PROTECTION AGENCY'S RESPONSE TO PETITION FOR WRIT OF MANDAMUS

## Background

1. I, Edward Messina, declare under penalty of perjury that the following statements are true and correct to the best of my knowledge and belief and that they are based upon my personal knowledge, information contained in the records of the United States Environmental Protection Agency (EPA), and/or information supplied to me by EPA employees under my supervision and in other EPA offices. *See* 28 U.S.C. § 1746.

2. I am the Director of EPA's Office of Pesticide Programs (OPP), EPA. I have held this position since July 2021. Prior to becoming the Director of OPP, I served as the Acting Director of OPP from June 2020 to July 2021, the Deputy Office Director (Programs) of OPP from June 2019 to June 2020, and the Acting Deputy Office Director (Programs) of OPP from March 2018 to June 2019. Prior to becoming Acting Deputy Office Director (Programs) of OPP, I served in various positions within EPA

    since September 1996, including in the Office of Enforcement and Compliance Assurance and in the Office of Regional Counsel. I have a B.A. in Economics from Brandeis University and a J.D. and Master's in Environmental Law and Policy from Vermont Law School.

3. OPP is the office within EPA that regulates the distribution, sale, and use of pesticides in the United States under the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA) and establishes, leaves in effect, modifies, or revokes tolerances for pesticide chemical residues in or on food under the Federal Food, Drug, and Cosmetic Act (FFDCA).

4. Part of OPP's responsibility includes implementing the periodic "registration review" of pesticides as required by section 3(g) of FIFRA, 7 U.S.C. § 136a(g). EPA's essential responsibility under registration review is to review each registered pesticide at least every 15 years to determine whether it continues to meet the FIFRA standard for registration. As part of the registration review of a pesticide, EPA also evaluates whether existing tolerances are safe under the FFDCA standard, whether any changes to existing tolerances are necessary or appropriate, and whether any new tolerances are necessary to cover residues from the pesticide.

5. EPA establishes maximum residue limits, or "tolerances," for pesticide residues in food and feed commodities under FFDCA section 408. Without a tolerance or an exemption from the requirement of a tolerance, food containing a pesticide residue is "adulterated" under FFDCA section 402 and may not be legally moved in interstate commerce. The standard to establish, leave in effect, modify, or revoke a tolerance is stated in FFDCA section 408(b)(2)(A)(i): "The Administrator may establish or leave in effect a tolerance for a pesticide chemical residue in or on a food only if the Administrator determines that the tolerance is safe. The Administrator shall modify or revoke a tolerance if the Administrator determines it is not safe." 21 U.S.C. 346a(b)(2)(A)(i). "Safe" is defined by FFDCA section 408(b)(2)(A)(ii) to mean that "there is a reasonable certainty that no harm will result from aggregate exposure to the pesticide chemical residue, including all anticipated dietary exposures and all other exposures for which there is reliable information." *Id*. Among the factors that must be addressed in making a safety determination, FFDCA section 408(b)(2)(D) directs EPA to consider "validity, completeness, and reliability of the available data from studies of the pesticide chemical and pesticide chemical residue." *Id.* at

2

    346a(b)(2)(D). In addition, risks to infants and children are given special consideration. Specifically, FFDCA section 408(b)(2)(C) requires that EPA assess the risk of pesticides based on "available information concerning the special susceptibility of infants and children to the pesticide chemical residues, including neurological differences between infants and children and adults, and effects of *in utero* exposure to pesticide chemicals . . . ." *Id*. at 346a(b)(2)(C). This provision also creates a presumption that EPA will use an additional safety factor for the protection of infants and children. Specifically, it directs that "[i]n the case of threshold effects, . . . an additional tenfold margin of safety for the pesticide chemical residue and other sources of exposure shall be applied for infants and children to take into account potential pre- and post-natal toxicity and completeness of the data with respect to exposure and toxicity to infants and children." *Id.* EPA is permitted to "use a different margin of safety for the pesticide chemical residue only if, on the basis of reliable data, such margin will be safe for infants and children." *Id.*

6.     Tolerances are established, modified, or revoked by rulemaking under the unique procedural framework set forth in the FFDCA. Generally, a tolerance rulemaking is initiated by the party seeking to establish, modify, or revoke a tolerance by means of filing a petition with EPA. *See* FFDCA section 408(d)(1), 21 U.S.C. 346a(d)(1). EPA publishes in the Federal Register a notice of the petition filing and requests public comment. After reviewing the petition and submitted comments, FFDCA section 408(d)(4) provides that EPA may issue a final rule establishing, modifying, or revoking the tolerance; issue a proposed rule to do the same under the process laid out in 408(e); or issue an order denying the petition. *Id*. at 346a(d)(4).

7.     While the FFDCA authorizes the establishment of legal limits for pesticide residues in food, FIFRA section 3(a) requires the approval of pesticides prior to their sale and distribution and establishes a registration regime for regulating the use of pesticides. FIFRA regulates pesticide use in conjunction with its registration scheme by requiring EPA to review and approve pesticide labels and specifying that use of a pesticide inconsistent with its label is a violation of federal law. FIFRA registrations are assessed for "unreasonable adverse effects on the environment," which is defined in part as "any unreasonable risk to man or the environment, taking into account the economic, social, and

        environmental costs and benefits of the use of any pesticide." FIFRA section 2(bb), 7 U.S.C. 136(bb). The safety standard under the FFDCA is incorporated into the FIFRA unreasonable adverse effect standard, as "a human dietary risk from residues that result from a use of a pesticide in or on any food inconsistent with the [FFDCA safety standard]."

8. FIFRA also directed EPA to reassess registered pesticides in two different review schemes. The first—reregistration—required EPA to reregister each pesticide that was registered before November 1, 1984, and to reassess all tolerances in effect on August 2, 1996 by 2006. *Id*. at 136a-1; 21 U.S.C. 346a(q). The second—registration review—requires EPA to re-evaluate pesticides under the FIFRA standard every 15 years under a program known as "registration review." The deadline for completing the current registration review for the organophosphates is October 1, 2026. 7 U.S.C. at 136a(g).

9. Coordination of regulatory action under FIFRA and the FFDCA occurs as a result of the integrated statutory standards, as well as under FFDCA section 408(l), which contains several provisions relating to how actions under each statute may be coordinated with the other. For example, FFDCA section 408(l)(1) directs EPA coordinate, to the extent practicable, revocations of tolerances with pesticide use cancellations under FIFRA.

10. Several divisions within OPP are involved in registration review. For purposes of this declaration, I will focus on four: the Pesticide Re-Evaluation Division (PRD), the Health Effects Division (HED), the Environmental Fate and Effects Division (EFED), and the Biological and Economic Analysis Division (BEAD).

11. PRD is the lead division overseeing the registration review of conventional pesticides[1] that are currently registered under FIFRA, including organophosphate (OP) pesticides. PRD develops EPA's regulatory position as to whether such pesticides continue to meet the

---

[1] Conventional pesticides are all active ingredients other than biological pesticides (i.e., certain types of pesticides derived from natural materials such as animals, plants, bacteria, and minerals) and antimicrobial pesticides (i.e., pesticides intended to disinfect, sanitize, reduce, or mitigate growth or development of microbiological organisms or provide certain protections against bacteria, viruses, fungi, protozoa, algae, or slime). Conventional pesticides are generally synthetic chemicals that prevent, mitigate, destroy, or repel any pest or that act as plant growth regulators, desiccants, defoliants, or nitrogen stabilizers.

FIFRA standard for registration. PRD also conducts rulemakings to implement tolerance actions under FFDCA that EPA determined were necessary or appropriate during registration review. PRD's work is supported by HED, EFED, and BEAD.

12. HED develops human health risk assessments for both the registration review of conventional pesticides under FIFRA and for tolerance actions under FFDCA. This involves evaluating the potential risks (taking into account hazard and exposure) from dietary exposures (food and water), from any non-occupational (e.g., residential, spray drift) exposures, and from exposures to workers (including persons exposed while handling pesticides as well as those entering areas previously treated with pesticides (e.g., to scout fields or harvest crops)) associated with conventional pesticides.

13. EFED assesses the environmental fate[2] and ecological risk of conventional pesticides. Part of this responsibility includes evaluating potential effects to species listed as threatened or endangered (listed) species and their designated critical habitats under the Endangered Species Act (ESA). Where EPA determines that a pesticide may affect, and is likely to adversely affect, listed species, EPA prepares biological evaluations and provides them to the National Marine Fisheries Service and the United States Fish and Wildlife Service (collectively, the Services) when it initiates formal consultation.

14. The Biological and Economic Analysis Division (BEAD) provides pesticide use-related information, information on agronomic practices, and economic analyses in support of pesticide regulatory activities. BEAD develops information about how much and the way pesticides are used to help EPA evaluate potential exposures, the need for various pesticides, and the potential agronomic and economic impacts of regulatory options.

15. In addition to registration review, HED, EFED, and BEAD provide support for pesticide registrations, amendments to registrations, tolerance rulemakings, and other pesticide regulatory activities.

---

[2] In this context, "environmental fate" is the life cycle of a chemical (such as a pesticide) after its release into the environment.

5

16. In my role as Director of OPP, among other duties, I am responsible for the management, coordination, and oversight of national pesticide programs under FIFRA and FFDCA. I am responsible for all regulatory activities associated with pesticides, including pesticide registrations, amendments to registrations, registration review cases, and tolerance rulemakings. I also oversee the evaluation of potential impacts of pesticides to listed species and any designated critical habitats to meet EPA's ESA obligations for pesticide actions through coordination with other federal agencies. In addition, I handle management and operational responsibilities across a full range of programmatic issues, providing program policy guidance and oversight over OPP's appropriated budget, resources, personnel, and the implementation of Agency policies.

17. This declaration is filed in support of EPA's Response to Petition for Writ of Mandamus to describe EPA's ongoing review of the OPs; EPA's plans for responding to the 2021 OP petition; and EPA's other pesticide regulatory responsibilities.

### EPA's Ongoing Review of the OPs

18. The OPs are a group of closely related pesticides that are primarily used to control insect pests. As part of the Reregistration process, EPA identified many high benefit uses for the OPs, including protecting numerous agricultural crops from destructive insect pests, protecting livestock, and protecting people including the control of disease-carrying mosquitoes. Given the important role OPs play for protecting food production and public health, EPA carefully reviews the OPs to minimize the impacts on people benefiting from these and other important uses where the best available science permits their continued safe use.

19. The OPs, which affect functioning of the nervous system, share the ability to cause neurotoxicity through inhibition of an enzyme, called acetylcholinesterase (AChE), that is responsible for breaking down the neurotransmitter acetylcholine. Neurotransmitters are chemical messengers that transmit messages across the nervous system and to parts of the body. When exposure to an OP occurs, the AChE enzyme becomes unable to perform its role in breaking down acetylcholine, eventually leading to insect death. In humans, at high levels of OP exposure, the resulting build-up of acetylcholine can cause a suite of neurological effects, such as tremors, fatigue, and nausea. EPA has a long history of

6

using AChE inhibition as a health-protective endpoint, or the adverse effect that forms the basis for OP human health risk assessments.

20. The OPs were included in the EPA's first priority group of pesticides to be reviewed under FIFRA and FFDCA. In 2006, EPA completed FIFRA section 4 reregistration and FFDCA section 408(q) tolerance reassessment for the OPs and determined those tolerances were safe and should be left in effect.

21. Because all OPs share a common mechanism of toxicity (AChE inhibition), EPA was also required to conduct a cumulative risk assessment that evaluated the combined human dietary and non-occupational exposure to all the OPs. In 2006, EPA determined that these cumulative exposures were also safe.

22. Having completed reregistration and tolerance reassessment, EPA is required to complete the next reevaluation of the OPs under FIFRA section 3(g) registration review by October 1, 2026.[3] Given ongoing scientific developments in the study of the OPs, EPA prioritized registration review of the OPs by opening public dockets and releasing preliminary work plans in 2008-2009.

23. The registration review of the OPs has proven to be far more complex than originally anticipated. The OPs presented EPA with numerous novel scientific issues that the Agency has taken to multiple FIFRA Scientific Advisory Panel (SAP)[4] meetings since the completion of reregistration in 2006, including issues related to potential human health risks associated with neurodevelopmental effects.

24. In 2015 (with updates in 2016), EPA performed a review of available epidemiological, laboratory animal, and in vitro studies to evaluate the potential for OPs to produce neurodevelopmental effects, and the review identified uncertainties associated with the doses at which these potential effects may occur. Despite recognizing several limitations and inconsistencies in the available studies, EPA conservatively assumed at that time that all the OPs cause similar neurodevelopmental effects and

---

[3] Congress extended the deadline from October 1, 2022 to October 1, 2026 under Section 711 of the Consolidated Appropriations Act, Pub. L. 117-328 (Dec. 29, 2022).
[4] The FIFRA SAP is a federal advisory committee created by FIFRA section 25(d), 7 U.S.C. 136w(d), and serves as EPA's primary source of peer review for significant regulatory and policy matters involving pesticides.

7

    retained, in addition to the default 10X interspecies and intraspecies uncertainty factors, the default 10X FQPA safety factor[5] for dietary/non-occupational risk assessments or a comparable 10X database uncertainty factor for occupational risk assessments, for all OPs. However, EPA intended to continue to evaluate the epidemiology studies and pursue approaches for comparing doses that elicit AChE inhibition with those associated with potential neurodevelopmental outcomes prior to revising the human health risk assessments for each of the OPs.

25. From 2015 to 2020, consistent with the Agency's standard registration review practices, EPA completed initial human health risk assessments for registration review for each of the OPs at issue in this case, except phorate.[6] Using AChE inhibition as the health-protective endpoint and applying default interspecies and intraspecies uncertainty factors, as well as the 10X FQPA safety factor for the dietary/non-occupational risk assessments or a comparable 10X database uncertainty factor for occupational assessments, EPA's assessments identified risk estimates of concern for each of these OPs.

26. Typically, the next steps in the registration review process are to assess the benefits of uses posing risks of concern, identify mitigation measures to address any identified risks of concern, assess the impacts of measures on users of the pesticide, discuss appropriate measures to balance the risks and benefits with the pesticide registrants, and make a proposed decision publicly available in a Proposed Interim Registration Review Decision for a 60-day public comment period. However, the loss of the use of OPs might have a significant economic impact on food production and disease prevention. Therefore, as discussed in the paragraphs below, EPA was also engaged in work with stakeholders and the international community to develop and incorporate new data to inform uncertainty and/or safety factors for OP human health risk assessments. EPA was concerned about moving forward with decisions based on the 2015-2020

---

[5] The FQPA safety factor is a statutorily mandated uncertainty factor that was incorporated into section 408(b)(2)(C) of the FFDCA by the 1996 Food Quality Protection Act. Pub. L. 104-170 (1996). That provision directs EPA to apply an additional tenfold margin of safety to account for potential pre- and post-natal toxicity and the completeness of toxicity and exposure databases for the protection of infants and children, unless there is reliable data to support a different safety factor that is safe for infants and children. 21 U.S.C. 346a(b)(2)(C).

[6] EPA completed its most recent human health risk assessment for phorate in 1999 in support of FIFRA section 4 reregistration.

assessments since that emerging science could allow for more accuracy and refinement of various default uncertainty and safety factors rather than relying on default factors and thus potentially impact the risk conclusions identified in the 2015-2020 assessments. EPA decided to revisit the registration review schedule and revise the human health risk assessments to incorporate the emerging science.

27. Since 2016, EPA has been working with stakeholders and international regulatory counterparts to better understand the potential for the OPs to cause neurodevelopmental harm and the doses that may be associated with these potential effects. An international effort spanning more than a decade led to the development of a battery of in vitro tests that evaluate key neurodevelopmental processes. In 2020, this developmental neurotoxicity (DNT) battery was reviewed by the FIFRA SAP. The FIFRA SAP agreed that data from this in vitro DNT battery can be used as part of an overall weight of evidence analysis when evaluating the DNT potential of a chemical, which means data from the battery can reliably be used with other sources of information EPA uses to assess risks with respect to DNT. Additionally, guidance on the use of the DNT battery was approved and released by the Organization of Economic Cooperation and Development in 2023.

28. The DNT battery provides high quality data for individual OPs that were not available at the time of EPA's 2015-2016 review of neurodevelopment processes. The new data demonstrate that differences exist across OP chemicals with respect to their potential to elicit neurodevelopmental effects; no consistent pattern emerged to suggest that all organophosphates share a common pathway for potential DNT. Such differences were also previously seen in epidemiological studies and laboratory animal studies for the OPs, and the new data corroborate those findings. As a result, the currently available data do not support the assumption that all OPs have the same potential to elicit neurodevelopmental outcomes or that these potential outcomes would have similar quantitative relationships with AChE changes (i.e., how close or far apart are the doses that elicit potential DNT and AChE changes). This has prompted EPA to reevaluate its approach to assessing the DNT potential of the OPs.

29. In 2023, EPA released a paper outlining its new approach for evaluating DNT potential for the OPs. The Agency determined, based on the best

9

available science, that the DNT potential of the OPs should be evaluated on a chemical-by-chemical basis, not as a group. Consequently, EPA now uses chemical-specific data and information in a weight-of-evidence evaluation of DNT potential for individual OPs to inform appropriate FQPA safety factor determinations. Given the 10X FQPA safety factor was previously retained across the OPs as a group due to the uncertainty related to the doses that may be associated with DNT effects, these chemical-specific evaluations provide EPA with the opportunity to use the best available science to address this uncertainty in a methodical and consistent fashion. In doing so, EPA is able to make a better-informed decision on an appropriate FQPA safety factor for each individual OP. To do so, EPA considers high quality, chemical-specific data from three primary lines of evidence (epidemiological studies, studies in laboratory animals, and in vitro assays) in the weight-of-evidence evaluations for DNT potential in conjunction with other FQPA safety factor considerations, such as completeness of the toxicological database, evidence of neurotoxicity, evidence of sensitivity/susceptibility, and residual uncertainty in the exposure database.

30. In addition to its work on developing an approach to incorporate the DNT battery data into its weight of evidence evaluations of DNT potential, EPA has also prepared and presented to the 2020 FIFRA SAP a methodology for developing data-derived extrapolation factors (DDEFs), based on in vitro AChE inhibition data, that can be used in individual OP risk assessments in lieu of the default interspecies uncertainty factor. This methodology was supported by the FIFRA SAP in 2020, and in December 2023, EPA completed its review and analysis of these in vitro AChE inhibition data to develop DDEFs. EPA concluded that the data are reliable to support an interspecies pharmacodynamic DDEF for 13 OP compounds. Accordingly, to ensure the accuracy of its scientific conclusions, EPA decided to revise the initial human health risk assessments to integrate the new approaches implementing the in vitro DNT battery and the in vitro AChE inhibition data where available and appropriate.

31. These chemical-specific FQPA safety factor determinations are summarized in the revised human health risk assessments and proposed interim registration review decisions that EPA has completed for acephate, dimethoate, and malathion, which are accompanied by

10

    supporting documentation that provide details of each chemical-specific weight-of-evidence evaluation of DNT potential.

32. EPA updated the occupational and non-occupational spray drift exposure risk assessments for several OPs. In March 2023, EPA released updated occupational and non-occupational spray drift exposure risk assessments for diazinon, ethoprop, tribufos and phosmet. Although registration review for these pesticides was not scheduled to be completed until a much later date, EPA took early action after recognizing that several uses of these four pesticides presented significant human health risks for workers doing various activities. To accelerate the mitigation of these risks, EPA worked with pesticide registrants to voluntarily cancel some products and use patterns, as well as implement other measures through pesticide product labeling. EPA put important protections in place quickly for some high-risk uses of these four pesticides, while allowing time to work through the complicated scientific issues that need to be addressed before completing registration review.

33. In addition to the human health assessments described above, before EPA completes its registration review of the OPs, EPA must conduct a cumulative risk assessment to consider whether use of the OPs pose a cumulative risk of concern. This assessment is completed after human health risk assessments are available for all the registered OPs and takes into account any refinements or mitigations for individual pesticides identified in those risk assessments.

34. EPA also must consider ecological risks, including those to listed and threatened species and their designated critical habitat. The assessment combines all the information from the toxicity tests (ecological effects), the exposure information, assumptions, and uncertainties in a way that helps the risk assessor understand the relationships between the ecological effects and the stressors (pesticides) and helps support decision-making. These assessments are underway.

35. For two of the OPs at issue in this case (malathion and diazinon) with respect to listed species, EPA issued final biological evaluations and initiated formal consultation with the Services. For malathion, EPA completed consultation with the Services and implemented the 2022 Biological Opinions by approving registration and labeling amendments

in 2023 and 2024. For diazinon, EPA completed consultation with the National Marine Fisheries Service and implemented that Biological Opinion by approving registration and labeling amendments in 2023. Based on requests for extension, EPA currently expects that the Fish and Wildlife Service's Biological Opinion for diazinon will be completed in 2028.

36. For eight of the OPs at issue in this case (acephate, bensulide, dimethoate, ethoprop, naled, phorate, phosmet, and tribufos), EPA must complete effects determinations and initiate consultation with the Services, as necessary, by September 2027.

37. To inform potential risk/benefit balancing, EPA will assess the benefits of the uses of a pesticide and the impacts of potential mitigation, as appropriate for the risk. This may involve coordination with USDA, state extension agencies, universities, and/or other stakeholders to gather data, which must then be analyzed. The level of complexity of such analyses is dependent on the severity of the risks as well as the use sites.

38. Finally, EPA has an obligation under the FFDCA sec. 408(p)(6) to ensure the protection of public health, with regard to pesticides that have an endocrine effect on humans. EPA is working to meet this obligation, including, where necessary, obtaining and reviewing endocrine-specific data, as part of registration review.

39. All these things taken together impact EPA's final conclusion on whether a pesticide continues to meet the FIFRA standard for registration.

**EPA's Plans for Responding to the 2021 OP Petition**

40. On November 18, 2021, EPA received the 2021 OP petition. The petition asks EPA to revoke tolerances and cancel registrations for the OPs at issue in this case[7] based on the risk estimates of concern identified in the 2015-2020 human health risk assessments. It also asks EPA to update the human health risk assessments to use an endpoint that petitioners allege better protects children from neurodevelopmental harm. In accordance

---

[7] The 2021 OP petition addresses two other OPs that are not part of this case: chlorpyrifos-methyl (for which all registrations were voluntarily canceled in 2022-2023) and dicrotophos (for which EPA issued an interim registration review decision in April 2025 identifying mitigation measures to address risks of concern).

12

       with section 408(d)(3) of FFDCA, 21 U.S.C. § 346a(d)(3), EPA published notice of the petition in the Federal Register and sought public comment. 87 Fed. Reg. 41,310 (July 12, 2022). EPA received over 54,152 public comments, comprising over 520 unique submissions.

41. As stated above, EPA has been diligently working to digest the complicated existing and updated science necessary to evaluate the potential for risk from exposure to organophosphates both prior to and after the submission of the 2021 OP Petition. Where risks of concern have been identified, EPA has engaged registrants in discussions to eliminate uses. This class of chemicals is complicated in nature, and the evolving science, along with the high benefits of these uses, warrants careful rather than quick analysis.

42. Typically, EPA's approach to responding to petitions is to respond to the petition in its entirety. Given the wide scope of the 2021 OP Petition, EPA intends to respond as appropriate for groups of organophosphates consistent with the available science and the Agency's ability to incorporate that into its human health risk assessments and registration review schedule.

43. The FFDCA portions of the 2021 OP Petition assert claims that relate solely to that statute's science-only safety standard. The FIFRA portions of the 2021 OP Petition, however, raise questions that require EPA to weigh risks and benefits of individual OPs and specific uses. This determination requires not only scientific analysis, but benefits analysis, as well as regulatory weighing of those risks and benefits. This work overlaps directly with the process EPA undergoes during registration review. Due to resource constraints and the need to consider benefits information in connection with the FIFRA claims in the 2021 OP Petition and in the interest of expediting the Agency's response, EPA plans to respond as follows.

44. For acephate, dimethoate, malathion, dichlorvos (DDVP), naled, tribufos, and chlorethoxyfos, EPA plans to respond to the claims raised in the 2021 OP Petition in 2026.

45. For terbufos, diazinon, bensulide, phorate, and ethoprop, EPA plans to respond to the FFDCA portion of the 2021 OP Petition in 2026 and the FIFRA portion in conjunction with ongoing registration review.

46. For phosmet, additional toxicity data is expected that is important for the human health risk assessment; thus, EPA plans to respond to the 2021 OP petition in conjunction with ongoing registration review.

47. EPA's public-facing schedule for registration review[8] was last updated August 27, 2024, and is currently out-of-date. Currently, EPA has not settled on an updated schedule for registration review for these OPs. However, due to EPA's obligations under ESA section 7(a)(2) (including, where appropriate, completing consultation with the Services), EPA does not currently expect to complete registration review for these OPs before October 2026. As noted above, completion of registration review includes completion of ESA consultation with the Services when appropriate, the schedule for which is not in directed by EPA.

### EPA's Other Pesticide Regulatory Responsibilities

48. EPA must balance its work on the OPs at issue in this case, including responding to the 2021 OP petition, with the Agency's other pesticide regulatory responsibilities. Those responsibilities include registration review of other pesticides, pesticide registrations, amendments to registrations, and tolerance rulemakings.

49. EPA estimates that since 2005, the number of pesticide actions before the Agency has ranged from 10,000 to 20,000 per year.

50. The OPs at issue in this case are 13 of 799 pesticides for which FIFRA section 3(g) requires EPA to complete initial registration review by October 1, 2026. Of those 799, PRD, with the support of HED, EFED, and BEAD, has responsibility for overseeing registration review for 477 conventional pesticides, including the OPs.

51. Under section 33 of FIFRA, 7 U.S.C. § 136w-8, EPA must make registration decisions on applications for new and amended pesticide products on time frames that run between three months and two years, depending on the nature and complexity of the action requested. In the past 5 years, EPA has received on average over 1,500 applications annually that are subject to the requirements of section 33. While many

---

[8] The online schedule can be found at https://www.epa.gov/pesticide-reevaluation/upcoming-registration-review-actions.

14

of those actions may require only minor scientific review (such as products that are substantially similar to currently registered products), the majority of those actions are either for new products, amended products, or other action requiring significant review, including, in many cases, the establishment of new tolerances under the FFDCA through rulemaking.

52. Unlike the petition response, Congress has given EPA statutory deadlines for completing actions under both section 3(g) and section 33 of FIFRA, and EPA must, as a result, devote a substantial amount of its resources to activities under these sections to meet its legal obligations.

53. EPA also has ESA compliance obligations for many of its pesticide regulatory activities. Pursuant to ESA, EPA conducts effects determinations for actions it takes under FIFRA, often through biological evaluations. Each of the 799 pesticides for which FIFRA requires EPA to complete initial registration review by October 1, 2026, is subject to formal consultation with the Services if it is determined that the pesticide is likely to adversely affect listed species or designated critical habitat. ESA compliance obligations also exist for many pesticide registrations and amendments to registrations. In total, EPA expects that hundreds of FIFRA actions may require consultations over the next decade.

54. EPA's prioritization of ESA work on FIFRA actions has been driven largely by litigation. In addition to the obligations for the OPs mentioned above, EPA is currently subject to court-enforceable deadlines to complete effects determinations by a certain date for 4 other pesticides. These effects determinations are only a handful of the total number that EPA would need to complete as part of past, current, and future FIFRA actions, including those needed for final registration review decisions.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

_____, August 19, 2025
Edward Messina
Director
Office of Pesticide Programs
U.S. Environmental Protection Agency

16